J. B. FISHER, Respondent, *v.* JOSEPH SELIGMAN,
Appellant.

June 17, 1879.

1. One to whom a deed of trust is given by a corporation to secure the pay-
ment of first-mortgage bonds, and to whom is issued paid-up stock to be
held by him for one year, that he may thus control the corporation and
secure the payment of interest on the bonds, the stock-book showing that
he is a stockholder and the transfer book showing that he holds the stock
in escrow, is not a stockholder by contract, and is not estopped to deny
that he is, as against one who became a creditor before he assumed the
rights of a stockholder by voting the stock.

2. A corporation has no power to pledge its unissued stock, and where it
assumes to do so the pledgee is not liable as a stockholder to a creditor of
the corporation who became such before the pledgee assumed to act as a
stockholder.

APPEAL from St. Louis Circuit Court.
*Reversed and remanded.*

HARDING & BULER and R. E. ROMBAUER, for appellant:
There never was a contract between defendant and the
corporation, making defendant a stockholder. — *Brewster* v.
*Hartley*, 37 Cal. 15 ; *Seymour* v. *Sturgess*, 26 N. Y. 134,
145 ; *Pittsburgh, etc. R. Co.* v. *Gazzam*, 32 Pa. 340. And
defendant can show *aliunde* the stock certificate, and even
the books of the corporation, under what circumstances the
certificate was issued to J. & W. Seligman & Co. — *McMa-
hon* v. *Macy*, 51 N. Y. 155, 161 ; *Tonica, etc. R. Co.* v. *Stein*,
21 Ill. 96, 98 ; *Lathrop* v. *Kneeland*, 46 Barb. 432, 438 ;
*Jones* v. *Railroad Co.*, 32 N. H. 544 ; *Pittsburgh, etc. R. Co.*
v. *Stewart*, 51 Pa. St. 54. Defendant is not estopped from
asserting that he is not and was not a stockholder, no act of
his having induced plaintiff to alter, injuriously to himself,
his previous condition. — Big. on Estop. 473–560 ; *Welland
Canal Co.* v. *Hathaway*, 8 Wend. 480 ; *Howard* v. *Hudson*,
2 El. & Bl. 1 ; *Kinney* v. *Farnsworth*, 21 Me. 355 ; *Cum-
ming* v. *Webster*, 43 Me. 192 ; *Heath* v. *Bank*, 44 N. H.
174 ; *Brown* v. *Wheeler*, 17 Conn. 345. The proceeding is

statutory, and in derogation of the common law. The plaintiff must establish that defendant is liable under the statute, which he has failed to do. — 1 Wag. Stats. 301, sect. 9; *McMahon* v. *Macy*, 51 N. Y. 155–161; *Skouton* v. *Wood*, 57 Mo. 382.

BROADHEAD, SLAYBACK & HAEUSSLER, for appellant.

HIRAM J. GROVER and JOHN P. ELLIS, for respondent: The defendant is estopped, by his holding and use of the stock, from now taking advantage of his own wrong, — from saying he did not acquire it in a lawful manner. — *Gold Mining Co.* v. *Bank*, 6 Otto, 640; *Pullman* v. *Upton*, 6 Otto, 328; *Wight* v. *Railroad Co.*, 16 B. Mon. 4; *Railroad Co.* v. *Tipton*, 5 Ala. 807; *McRae* v. *Russell*, 12 Ired. 224; *Ferry Co.* v. *Jones*, 39 N. H. 491; *Everhart* v. *Railroad Co.*, 28 Pa. St. 339; *Slocum* v. *Providence Steam Co.*, 10 R. I. 112; *Abbott* v. *Aspinwall*, 26 Barb. 202; *Palmer* v. *Sansum*, 3 Sandf. S. C. 171; *Kansas City Hotel* v. *Harris*, 51 Mo. 464; *Barrett* v. *Schuyler County*, 44 Mo. 197; *Plank-road Co.* v. *Rice*, 7 Barb. 167; *Lane* v. *Brainerd*, 30 Conn. 565–576; *McHose* v. *Wheeler*, 45 Pa. St. 32. The beneficial use of stock renders the holder liable as a shareholder.—*Maguire's Case*, 3 De G. & Sm. 31 (affirmed in *Bunn's Case*, 2 De G. F. & J. 295); *St. Charles Man. Co.* v. *Britton*, 2 Mo. App. 290; *Webster* v. *Upton*, 1 Otto, 68. The capital to be paid in is a fund which the officers cannot give away. — *Upton* v. *Tribilcock*, 1 Otto, 45; *In re Bachman*, 12 Bank. Reg. 223. It is no defence to a suit by creditors to show that the holder took and held the stock as the agent of the corporation. — *Sanger* v. *Upton, supra*. One who holds and uses stock, and so gets benefit from it, is liable to the creditors of the corporation, even though it be issued as collateral security, or in trust to secure a debt due the corporation from one so holding the stock. — *Wheelock* v. *Kost*, 77 Ill. 296 (approved in *Pullman* v. *Upton*, 6 Otto, 328). If one holding stock as trustee is beneficially or practically the owner of it, he will

be held as a stockholder. — *American Railway Frog Co.* v. *Haven*, 101 Mass. 398. The obligation of one who exercises the rights of a stockholder is to be construed against him and in favor of creditors. — *Farrar* v. *Walker*, 3 Dill. 506. " The acceptance and holding of a certificate of shares in an incorporation makes the holder liable to the responsibility of a shareholder." — *McLaughlin* v. *Detroit R. Co.*, 8 Mich. 100 ; *Holbrook* v. *New York Zinc Co.*, 57 N. Y. 616 ; *Pullman* v. *Upton*, 6 Otto, 328 ; *Rosevelt* v. *Brown*, 1 Kern. 151.

BAKEWELL, J., delivered the opinion of the court.

This is a proceeding by motion under the statute by a judgment creditor of an insolvent corporation for execution against a stockholder. The question to be determined is whether, upon the facts admitted and proved upon the trial, appellant was liable as a stockholder of the corporation. The Circuit Court ordered execution to issue, and from this judgment the alleged stockholder appeals.

It appears that on May 15, 1874, plaintiff obtained judgment for $2,450 against the corporation defendant, on an indebtedness which accrued on January 21, 1874. The corporation was then and is insolvent. It is organized under our general law, with a capital stock of $10,000,000. The alleged stockholder is a member of the firm of J. & W. Seligman, bankers, in New York. On March 14, 1872, this firm entered into an agreement with the corporation defendant, which recites that the road has been graded, bridged, and tied, and the right of way obtained, for twenty-seven miles, all which has been paid by the proceeds of municipal subscriptions aggregating $645,000. The Seligmans are appointed financial agents of the road, and agree to make advances to enable it to procure iron and equipments ; in consideration of which the road agrees to deposit with the Seligmans, for sale, its entire issue of first-mortgage bonds, and also to deposit with them a majority

of the capital stock which the road is authorized to issue, the stock to remain in the control of the Seligmans for one year at least.

To carry out this agreement, a deed of trust was executed on May 1, 1872, to Jesse Seligman and another, as trustees, conveying the road and all its property and franchises, to secure $1,900,000 worth of bonds, of the denomination of $500 and $1,000, with interest. The deed provides that in case of default of interest the property conveyed shall be surrendered to the trustees on demand. The bonds mature in thirty years. A certificate of stock, dated May 28, 1872, issued to J. & W. Seligman for 60,000 shares in the defendant corporation, of $100 each, was produced on the trial from the possession of Seligman; as to which he testified that this stock was not paid for, or subscribed for, but issued as paid-up stock, in order that his firm might control the management of the company and the election of officers. This certificate was issued in accordance with a resolution of the board of directors ordering that, in making negotiations for money with the Seligmans, certificates for a majority of the stock be issued to them, to hold in trust for a period of twelve months. It was admitted that only $800,000 worth of bonds were issued, of which the Seligmans, having made large advances on the bonds, became owners to the amount of $400,000. Then, in 1873, at a meeting of the Seligmans and other bondholders in New York, at which Judge Baker was present, it was agreed that Baker should become a director and president, with a view to protecting the bondholders. A proxy was accordingly made out by the Seligmans and handed to Baker, which proxy was voted by Mr. Blow for the Seligmans at the annual election in March, 1874, at which election Baker named the ticket, Seligman being named as one of the directors and Baker as another. The ticket was elected; Judge Baker then became president. Baker says the Seligmans knew, in a general way, of these acts, and that from the time of his connection with the road

to the foreclosure of the mortgage, the road was controlled by the six millions of stock issued to the Seligmans. During the ten months that Judge Baker was president of the road, he did not apply its earnings to the payment of interest. The newly elected directors held only one meeting, which was held in October, 1874, under the presidency of Judge Baker; at which meeting they did only one thing, — that is, they turned over the road to the trustees mentioned in the mortgage, Seligman and Stewart, for non-payment of interest.

The stock-book of the road, which contains merely the list of stockholders, without the number of shares, shows the names of J. & W. Seligman as stockholders.

The transfer-book has the following entry : —

| Name. | Residence. | Date. |
|---|---|---|
| J. & W. Seligman. | New York, N. Y. | May 29, 1872. |

| No. of Shares. | Amount in Dollars. |
|---|---|
| 60,000. Sixty Thousand. (Held in escrow.) | 6,000,000. Six Millions. |

These books are kept in obedience to the requirements of the corporation law of the State. Wag. Stats. 300, sect. 8.

Under our statute (Wag. Stats. 291, sect. 13), where execution against a corporation is returned *nulla bona*, then execution may issue against any stockholder for the amount unpaid upon his stock, on order of court, made upon motion with notice to the stockholder. The statute also provides (Wag. Stats. 301, sect. 9) that "no person holding stock in any such company as executor or trustee, and no person holding such stock as collateral security, shall be personally subject to any liability as a stockholder of such company; but the person pledging such stock shall be considered as holding the same; and shall be liable as a stockholder accordingly, and the estate of such executor shall be liable," etc.

It is contended by learned counsel for appellant that on this state of facts Seligman Brothers are not liable by contract nor by estoppel, and that they are expressly exempted from all liability to a creditor of the corporation by the language of the law just quoted. So far as the first proposition goes, it must be granted that the Seligmans are not liable to the corporation by contract. So far is this from being the case, that the obvious meaning of the agreement between them and the corporation was that they should incur no liability to the company. The shares were issued as paid-up shares; that is, as shares the whole nominal amount of which was paid up to the company, and for which nothing was due to the company.

But must the bargain with the company be the measure of the obligation of the stockholder? It is true that this has been said in England in cases under the act of 1862, the Joint-Stock Companies Act (*Ex parte Currie*, 32 L. J. (Ch.) 57; *Guest* v. *Worcester Railway Co.*, 38 L. J. (C. P.) 23), where the reasoning is: The agreement was either valid or invalid; if valid, the stockholder should not be called on to contribute, because it protects him from liability; if invalid, the transaction is to be disregarded. This act changed the remedy against the company provided by former enactments, under which execution could issue against the shareholders, into a right to obtain satisfaction of his debt by forced contributions, either by compelling a winding up of the company, or by becoming a party to a winding-up already ordered. *Oakes* v. *Turquand*, 2 H. L. Cas. 347. The official liquidator stands in the position of the company, and winds it up for all concerned; and it seems that he cannot repudiate the contracts of the company, and that, under the act, creditors are bound by them. Lindley on Part. 65, 72. But may it not be said that our statute in effect declares that, until his stock is fully paid, each shareholder is individually liable to creditors so soon as an execution is returned unsatisfied; and

that the creditor, with us, does not claim through the company, but claims a right personal to him, and exercised even adversely to the company? So in England, under the old statutory provision, which was somewhat similar to our own, where paid-up shares had been taken which were not really paid up, Lord Justice Turner said (*Ex parte Daniell*, 1 De G. & J. 377): "The argument rests upon this basis, that, in determining this case, we are to look to contract, and to contract only; and I think that basis is unsound." See remark of Lord Cairns in *Smith* v. *Reese River Co.*, L. R. 2 Eq. 264; *Henderson* v. *Bank*, 7 El. & Bl. 356.

The doctrine of some of the English cases under their existing law, if applied to cases arising under our law, — that the rights of creditors cannot be greater than rights of the company,— would work injustice. There seems to be a right to depend upon the statutory contract between the creditors and the stockholders, and the liability imposed on the shareholder as soon as he takes stock. The stockholder has notice of the right given to creditors, under the law, to proceed against him; and if the issue of stock as paid up on which nothing has been paid is a fraud upon creditors, he has notice also of this, and that he will not be allowed, in a proceeding by the creditors against him, to set up as a defence his real contract with the corporation.

So, in Connecticut, where a bank was incorporated under a lawful charter, but the parties who effected the organization fraudulently induced a person to subscribe for a portion of the stock by representing to him that his subscription would be merely nominal and that he would not be required to pay for the stock, and the bank afterwards issued a large amount of bills, but soon failed and went into the hands of a receiver for the benefit of its creditors; in an action by the receiver against the subscriber, it was held that he could not, as a defence to a claim for the amount of the subscription, show the fraud or misrepresentation under

which he had been induced to subscribe, as he and his associates constituted the bank, and he was therefore a party with them to the fraud upon the public. *Litchfield Bank* v. *Church*, 29 Conn. 137.

But, before proceeding to the ground of estoppel, it may be well to consider for a moment what is capital stock, and what a shareholder is ; and then we shall see what underlies the pretence of an issuing of unissued stock as a pledge by the corporation itself.

Under an ordinary partnership, if the profits may be great, the risk is also great. In a stock company the profits may be unbounded, but the liability of each member is strictly limited by the amount of shares of stock that he holds. Membership in the company is created by, and consists in, the ownership of shares (*Schaeffer* v. *Insurance Co.*, 46 Mo. 248) ; and it is by holding stock that several persons can unite their capital in a business enterprise without incurring a partnership's liability, or even any liability for the debts of the body of which they are members. They are liable only to the corporation itself for the amount of stock subscribed or held by them, and liable to creditors, in the absence of any statute, only because, being liable to the corporation, they can by equitable processes be made to pay to the creditors of the corporation what they owe to the corporation itself.

Stock is the money or capital invested in the business, and is usually divided into shares of equal value, held by owners or stockholders, the evidence of which is usually furnished by certificates of the same, signed by the *proper* officers of the company. Field on Corp., sect. 123. A stock certificate, issued by a corporation having the power to issue it, is a continuing affirmation of the ownership of the specified amount of stock by the person named therein. *Holbrook* v. *Zinc Co.*, 57 N. Y. 616.

" Stock," says Judge McLean, in *Sturges* v. *Stetson*, 1 Biss. 249, " can be created only by contract, whether it be

in the simple form of subscription or in any other mode. There must be an agreement to take the stock, and nothing short of this can create it. This imparts to the stock the quality of property, which before it did not possess. It is called capital stock in the charter, because the corporate capacity to create is given. The term ' stock,' as used in the charter, before it is taken by subscription, means nothing more than a power in the directors to receive subscriptions for stock. Capital stock does not mean stock named in the charter, and for which no subscription has been made. Such stock is a legal fiction. It is, at best, nothing more than a right to subscribe for stock. A power given to the directors to pledge the capital stock is intended to cover the capital stock owned by the stockholders, which was property that might be mortgaged.'' Neither the board of directors nor the whole body of the corporation have power to create stock which the certificate purports to represent, by the mere issue of a certificate. *Bank* v. *Railroad Co.*, 13 N. Y. 612. This is said in a case where the issue was in excess of the number of shares limited by the charter. But the remark is true of all cases in which nothing was received for the share, and in which the rights of an innocent purchaser for value are not involved. If part of the capital remains untaken, the right to issue it is a corporate franchise, and the property thus held is in trust for the benefit of the corporators, and if disposed of, it must be for the benefit of all the stockholders. *Reese* v. *Bank*, 31 Pa. St. 78. And it is held that even a sale of stock by the directors for a less rate than that fixed by the charter is a fraud on the stockholders. *Sturges* v. *Stetson, supra.*

The capital stock of a corporation is a trust fund for the payment of its debts. This doctrine, asserted by Judge Story half a century ago in *Wood* v. *Dummer*, 3 Mason, 308, has been constantly followed in America. This capitalstock embraces all the assets of the corporation, but especially it embraces all stock subscribed ; and the unpaid balances are not only as much a part of the stock as the

money paid in and the property bought with that money, but it is often upon the faith of this unpaid stock that the company obtains credit, and this is the chief fund to which creditors look for payment of their demands. The creditor knows that the stockholders are bound to pay up for his benefit, and that the directors are bound, and can be compelled, to make them pay if the company is indebted and other resources fail. This doctrine is as old as the reign of Charles II. Ryl. on Corp. 273 ; *Adler* v. *Milwaukee, etc. Co.*, 13 Wis. 60.

Stockholders in a corporation, then, having notice of the trust character attaching to capital stock, are privies to the trust ; and whenever they have in their possession any of this trust fund, they hold it *cum onere*. Thomp. on Stock., sect. 13.

Hence the issue of paid-up shares otherwise than for value is a breach of trust on the part of the directors, and the creditors of the company are entitled to have such shares treated as not paid up, unless they are in the hands of *bona fide* holders for value without notice. 1 Lindley on Part. (4th Eng. ed.) 614, and cases cited. One who receives shares directly from the company as paid-up shares, having paid nothing for them, is therefore liable to those who have no notice of the real character of the transaction, and who are deceived by it to their hurt, as a participator in a wrong.

The act of subscribing to shares fixes the subscriber's liability to creditors as a shareholder, though he has done no other act as such, because it implies a promise to pay for them. *Spear* v. *Crawford*, 14 Wend. 20. And the same effect is given to the acceptance and holding of a certificate of stock. *Bingham* v. *Mead*, 10 Allen, 245 ; 8 Mich. 10. Hence it is held that subscriptions of stock made for a collateral purpose cannot on that ground be avoided as to creditors. Thus, where shares were received by a friend of the officers of the company to sell, and for that purpose were issued to him in his name, on the secret understanding that he was to incur no liability, but should account only

for the shares actually sold, and return the other shares to the company, it was held that the agent was liable nevertheless to the creditors of the corporation for the unsold shares. *Davidson's Case*, 3 De. G. & Sm. 21. So, shares taken merely to qualify one as a director, though nothing is to be paid for them, make one liable for the unpaid amount to the creditors of the corporation; and where a certain number of shares must be held as a qualification, it has been held that the mere fact that one acts as director makes him liable for the number of shares which, from the fact of his acting as director, creditors have a right to suppose he has. *Harward's Case*, L. R. 13 Eq. 30. One who has caused or allowed his title to stock to be registered on the books of a corporation, cannot deny the truth of that representation, and deny ownership when it has become a burden; and one who has acted as a stockholder is concluded from denying liability. *In re Reciprocity Bank*, 22 N. Y. 17; *Dayton R. Co. v. Hatch*, 1 Disney, 84.

The legal owner on the books is liable to the public. It is this which gives meaning and value to the registry of shares, and the courts, in the absence of statutes on the subject, do not look beyond the registered stockholder. A trustee of B. must pay, and look to B. for reimbursement. See Thomp. on Stock., Chap. X., sects. 178–182, and cases.

As in the case of partners, then, one may incur a liability to third parties when no real partnership exists, so one holding unpaid stock may be liable to a creditor of the corporation in a case where, owing to some secret understanding or equity between the corporation and the stockholder, no real indebtedness to the corporation exists. In either case, however, of course no liability can be incurred to one who has actual knowledge of the real state of affairs.

It is contended that the present case is one of a pledge of the stock by a corporation as collateral, and that by the express terms of our statute the pledgee of such stock, holding it as collateral, is not liable to a creditor.

How, it may be asked, can a corporation pledge its unissued shares? If such a power be conceded, what occasion is there for subscription at all ; and why may not a business corporation carry on its affairs by borrowing money for which stock is held as collateral, without having sold a single share, and issue stock for the amount of its indebtedness on which nothing is paid, on which nothing is due, and for which no one is liable to the creditors? Stock is regarded as notice to the world of a liability to creditors on the part of some real owner somewhere. It would seem, therefore, that there should always be a real holder of the stock to bear the burden. And so, under the English Winding-up Acts it is held that if shares are taken by a nominee or allottee of the company, to hold in trust for the company, the nominal holder will be put, in the winding up, on the list of contributors, and if injured by this, he must look to his *cestui que trust*. *Pugh's Case*, L. R. 13 Eq. 566 ; *Stover* v. *Flack*, 30 N. Y. 64.

In the case of *Johnson* v. *Laflin*, Thomp. Nat. Bank Cas. 331, the president of a national bank had bought shares of the bank and had them registered in the books of the bank in his name, as trustee for the bank. He desired to avoid personal liability ; but Judge Dillon, in that case, construing the United States Banking Act, whose provisions in this respect are the same as those of our State law (U. S. Stats., sect. 5152), says : " Britton is responsible personally, as he had no authority to act for the bank, and as there is no *cestui que trust* who is liable." Id. 346.

The provisions of the United States statute and of our own law are, as we have said, substantially the same, and would seem to take it for granted that there is always somewhere a real owner for stock. It is just that the naked trustee should not be responsible ; but behind the naked trustee there is supposed to be a real owner, and this is for the protection of creditors, insomuch that one holding stock in an embarrassed company would not be

permitted to shirk responsibility by assigning to an insolvent. But, while it is true that the Legislature may not have contemplated the case of a pledge of its own unissued stock by a corporation, and may have thought it against the true nature of capital stock that such a pledge should be made, it by no means follows that when such a case does arise, if it be held that the pledge can be and is made, the provision that no one holding the stock as collateral is liable as a stockholder to creditors can be disregarded.

Our statutory provision on this subject is adopted from the New York law of 1850, with which it is identical (2 Rev. Stats. N. Y. (Banks's 5th ed.) 11, 671); and our attention is called to *McMahon* v. *Macy*, 51 N. Y. 161, as an authoritative construction of the statute. It was held there that a stockholder who appeared in the books as absolute owner of stock might show that he held the stock as assignee, but merely as collateral security, not as absolute owner, and that he might thus avoid liability under the statute. But in that case there was a pledgeor, — there was somewhere an absolute owner, to whom the creditor could look.

A case directly in point is *Matthews* v. *Albert*, 24 Md. 527. In Maryland, as in Missouri, the provision of the New York statute has been adopted in the very words of the New York law. The section under consideration is construed. The case was this: A corporation issued to a creditor some of the shares as security for a loan. The certificate as issued to the creditor was absolute, and was held by him, without objection, for a month. He then applied to the president of the company, who, by his request, indorsed upon the certificate that it had been deposited as collateral for a loan of $2,000, and was to be returned on payment of the loan. It was held that the creditor holding the certificate was not liable. It did not appear that he had ever acted as shareholder, voted the stock, or received the dividends. The question of the right

to pledge the unissued shares is not considered; nor, indeed, are any reasons given for the conclusion reached. It being taken for granted that the shares as collaterals were really held as such, the case is ruled to be within the plain letter and within the meaning of the statute, and determines that the fact that the shares are held as collateral relieves the holders from liability by the very terms of the law.

The language of the act is express, that " no person holding such stock as collateral security shall be personally subject to any liability as a stockholder of such company." The succeeding clause, " but the person pledging the stock shall be considered as holding the same, and shall be liable as a stockholder accordingly," may be quoted to show that the legislature did not contemplate the case of the corporation pledging its own unissued stock. But that is not material, if, as we think, the corporation can make no such valid pledge. The holder of such shares as collateral, according to the plain language of the law, and the construction given to it in the case cited, is not to be held liable precisely as a stockholder, whatever liability he might incur by estoppel, or as party to a fraud.

There can, we think, be no reasonable doubt that, whatever may be said as to the power of a corporation to issue its unissued stock to secure a debt, the pledgee would be charged with the general responsibilities of a shareholder if he placed his name or allowed his name to remain on the register of the company as owner of shares on which nothing had been in fact paid, or if he should vote, or assume the rights of a shareholder; and these views, we see, are also those of the learned author of a recent work on the subject of the liability of stockholders, who has given the adjudged cases in England and America on this subject a thorough and careful examination. Thomp. on Stock., sect. 224.

It is because there is a vote for each share of stock that stock-registry books and transfer books are kept, that the

corporation and all interested may know who is and who is not entitled to vote; and the management of such a corporation is according to the will of the majority of its members, — that is, of its stockholders; no one but a stockholder has any right to a vote in its affairs.

Messrs. Seligman have, it would seem, asserted and exercised, by virtue of the certificate of stock held by them, all the rights of stockholders. That they have asserted them wrongfully, if the stock they pretended to hold had no real existence, would be immaterial so far as their liability to creditors who had notice of their acts is concerned. But it does not appear how this can give any strength to the claim of the plaintiff in this case, since these acts were all done and the stock voted after the indebtedness to plaintiff accrued.

At the time the indebtedness accrued, and before that time, this state of facts existed. A certificate of stock was issued in the usual form to the firm of Seligman. Nothing appeared on this certificate to show that they had no beneficial interest in the stock. Their name was on the stock-register as stockholders, and on the stock transfer-book as holding sixty thousand shares. The latter book, however, has an entry of the terms, of which persons dealing with the company on the faith of it must, of course, take notice. It says that this stock is held by the Seligmans, but it also says that it is held in escrow.

It may be said that the entry is incorrect, and that the stock was not held in escrow. The stock in question was delivered to the Seligmans, so far as the corporation could deliver it, and was delivered to them in order that, with the rights and powers which stock gives to the stockholders, they might, as they actually afterwards did, control the corporation, and that in the interest of the bondholders and of themselves, as holding a half-million of the bonds of the road. The statement, however, was notice that the Seligmans were not beneficial owners of the stock, and was eminently calculated to put the creditor on inquiry as to

whether any such beneficial owner did exist at all. The expression is used of a deed which, not being delivered, is a mere scroll and not a deed, and which cannot come into existence as a deed until delivery.

Stock issued by a corporation to a person to hold in escrow might therefore be taken to be stock that was not really, but as yet only potentially, stock; and in this view the expression is not altogether an inapt one, if the intention was to give notice to those dealing with the company that this Seligman stock was no asset of the corporation, and represented no property to which creditors should look. At any rate, it was enough to put those dealing with the company on the faith of the stock on their guard.

The statement was not that the Seligmans held the stock as trustees. The truth of the transaction would seem to be that the issue was illegal, and they did not hold the stock at all. The result is that the Seligmans are not liable to the plaintiff by estoppel; they are not liable by contract, and we do not see on what principle they can be held liable at all. We think that a corporation has no power to pledge its unissued stock, and that such stock has no value except in the hands of an innocent purchaser; but, if the pledge was valid, the statute is express that no person holding stock as collateral shall be liable as a stockholder.

By the written agreement, the stock was to remain in the hands of the Seligmans for a year at least, and, in fact, possibly for thirty years; for they say that the understanding was that the majority of the stock was to be deposited with them that they might control the company until the bonds were paid, and the bonds by their terms run for thirty years. One who takes stock to vote it for his own protection for thirty years, owning at the same time bonds of the corporation, ought, it would seem, to take the stock with its burden. A method of issuing bonds and selling no stock, but issuing paid-up stock on which nothing has ever been paid, to the bondholder, who is to vote the stock, and, when called on by a creditor, to say that,

though nothing has ever been paid on the stock, and no one is liable upon it; that his voting was illegal, though it gave him control of the road; and that he merely held the stock as collateral, though it represented no indebtedness of anybody, no property, and nothing but a right to vote, — would seem to be an ingenious evasion of the law, and could not avail the pledgee of the stock against a creditor of the company who had become so without any notice of the actual condition of affairs, and after these acts of ownership had taken place, and the stock thus been treated as issued for a valuable consideration, and really the property of the pledgee of the company. If the directors and bondholders could thus issue and receive shares on which nothing is paid and nothing is due, and without any liability on the part of any person as holder of the stock, business might be carried on with no such capital as was contemplated by the corporation act, and no such security as that law provides for the protection of the public. All the benefits of the corporation law would be obtained without shouldering the corresponding burdens. Such a practice leaves out of view the protection of the creditor, which is a main object of the law; and where a corporation thus attempts to pledge its unissued stock, we by no means hold that the pledgee who should have voted the stock, and assumed the position and exercised all the rights of an owner, would not be liable to creditors whose debts accrued subsequently to such acts. One who holds himself out as beneficial owner of stock, acts as owner of it, and gets from the stock every benefit which a beneficial owner could get, the controlling voice in the management of a road that had cost $645,000 before he had anything to do with it, which cost $800,000 after that, and which was encumbered for not very much more than half of its actual cost (such is the case presented here), cannot look to the statute for any protection against creditors who had been deceived by these circumstances into regarding him as the owner of stock really issued, and had therefore credited the company. But as

to a creditor who has not been deceived by anything said or done by the pledgee of the stock, or with his consent, into the belief that he owned the stock, there seems to be no sufficient reason why the pledgee should be liable to him.

The statute is, that one who holds the stock merely as security shall not be liable ; and whether there be a pledgeor of the stock who can be held or not, if the transaction appears in the stock-books in such a way that the creditor is fairly put upon his guard as to its nature, he cannot complain. If the transaction be an attempt on the part of the corporation to pledge its unissued stock, and the entries on the stock-books give notice of this, it must be apparent to the creditor that whether such an issue of stock be valid or not, in no case can such stock represent property that can be reached for the payment of his debt. The capital stock of a corporation is a fund for the payment of its debts, but unpaid stock entered in the stock-books, as the entry was in the present case, is not held out to the world as an asset of the corporation, as would be the case if the stock was simply entered in the name of the payee.

The judgment is reversed and the cause remanded. All the judges concur.